## THE PENNSYLVANIA STEEL COMPANY *vs.* JOHN L. NACE.

*Duty of Master to Provide Safe Place for Workman—Injury to Workman on Concrete Pier Not Sufficiently Hardened— Duty of Contractor Working on Pier Built by Third Party to See That it is Safe for his Men is Non-Delegable—Evidence.*

The rule that a master is bound to furnish a reasonably safe place for his servants to work in is applicable when the contractor for the erection of the structural iron work of a bridge on concrete piers built by a bridge company directs his workmen to put heavy weights on the piers before they have sufficiently hardened to support them, when that fact ought to have been known to those in charge, in consequence of which a workman is injured.

The fact that the construction work generally was under the control of the engineer of the bridge company does not relieve the contractor from liability to his workman in such case, for the duty to use due care to provide a safe place in which work is to be done cannot be delegated, and the contractor is liable for the negligence of the engineer in ordering or in allowing the piers to be used before they had hardened.

The defendant company was the contractor for placing iron girders and doing the other structural work on a bridge across the Potomac River. The bridge company had employed another contractor to erect the concrete piers. Plaintiff was an employee of the defendant in doing the structural work. Before all of the piers were finished the placing of the girders in position began, and these had been put on nine of the piers when the workmen came to the tenth pier, within less than a week after it was finished. Concrete begins its initial set within an hour or two after being mixed and placed, and then the hardening process follows; but massed concrete such as is used in pier construction requires at least three weeks' time to harden sufficiently to support heavy weights and if the weather be freezing a longer time is required. The concrete work on the tenth pier was finished December 9th. Thereafter for several days the thermometer hovered about the freezing point. On December 16th the defendant had caused two girders, each weighing about ten tons, and a derrick, weighing about forty tons, and other materials to be placed on this pier, and the plaintiff was there at work, when the pier suddenly crumbled and gave way, and plaintiff was hurled into the river and seriously injured. It is usual among builders to allow three weeks for concrete to harden before weight is put on it, and this fact ought to have been known by the defendant, but it was not known by the plaintiff, nor did he know that the pier was not in a safe condition at the time of the injury. In an action to recover damages therefor, the defendant contended that it followed a general custom in relying on the engineer of the bridge company as to the safety of the piers upon which the work was to be done, and that it was not required to make an inspection of its own. The pier was properly constructed, and its fall was due wholly to the fact that it was used before it had hardened. *Held,* that the plaintiff is entitled to recover for the injury so occasioned, since it was the duty of the defendant company to take precautions for the safety of its workmen, either by directing them not to go on the piers until three weeks had elapsed after their construction, or by making an inspection.

*Held,* further, that the defendant is not relieved from this duty by the fact that a custom exists among bridge builders to rely upon the engineer of the bridge company, nor by the fact that the defendant in this case relied on the engineer of the bridge company to see that the place where the defendant's employees worked was safe, and to warn them not to go on the piers until they had hardened. The duty imposed on the defendant in this respect cannot be delegated, and the defendant is liable to the plaintiff for the default of the enginer without regard to his general reputation for ability.

When the question is whether the defendant company was negligent or not in directing its workmen to put heavy weights on concrete piers before they had sufficiently hardened, evidence of experts is admissible in regard to the properties and hardening process of concrete, and the time it takes to dry out, and the usual time allowed for the hardening process, and as to the danger and the natural result of placing heavy weights on it before it has hardened.

*Decided June 23rd, 1910.*

Appeal from the Circuit Court for Washington County (HENDERSON and KEEDY, JJ.), where there was a judgment on verdict for the plaintiff for $5,500.

*Plaintiff's 1st Prayer.*—If the jury find from the evidence that on or about the 16th day of December, 1908, the plaintiff was employed by the defendant, and was then engaged in the work of placing the iron and steel superstructure on the bridge which was then being constructed across the Potomac River at Williamsport, as testified to by the witnesses, if the jury so find; then it was the duty of the defendant to exercise reasonable care to provide a reasonably safe place in which the plaintiff might perform the services for which he had been employed; and if the jury find that the defnedant's "traveler" and the superstructure was placed upon pier No. 10 in the manner as testified to by the witnesses and that the

plaintiff, under his said employment by the defendant, in order to perform the said services, was required to go upon the "traveler" and superstructure as testified to in this case; and further find that said pier No. 10 was constructed of concrete as testified to in this case, and that the construction of said concrete pier had been finished on or about December 9th, 1908, and further find that at the time the injuries complained of in this action were sustained, if the jury so find, the said concrete pier was green and had not become sufficiently hardened to support the weight of said "traveler" and superstructure which was then and there being placed upon it, as testified to in this case; and further find that whilst the plaintiff was using due care and caution on his part, if the jury so find, and whilst he was in the exercise of the duties required of him under his said employment, if the jury so find, the said pier No. 10 collapsed and gave way under the weight of said "traveler" and superstructure and thereby hurled and threw the plaintiff into the Potomac River below, whereby the plaintiff was injured, if the jury so find; and further find that the collapsing and giving way of said pier No. 10, and the hurling and throwing of the plaintiff as aforesaid, was caused by reason of the fact that said pier was then and there green and had not become sufficiently hardened, if the jury so find, then the plaintiff is entitled to recover in this action, provided the defendant knew or by the exercise of reasonable care could have known that said pier No. 10 was then and there green and had not sufficiently hardened, and that said condition rendered it unsafe for the weight the defendant placed upon it. And provided they further find that the plaintiff by the exercise of reasonable care on his part could not have known the said condition of said pier, if the jury so find, and the danger of using said pier in said condition. And the jury is further instructed that both as to the plaintiff and defendant no greater knowledge of the use of concrete in the character of work in which they were engaged is required than is ordinarily possessed by

well-informed persons in their respective occupations. (*Granted as modified.*)

*Defendant's 5th Prayer.*—There is no legally sufficient evidence in this case to enable them to find that prior to the happening of the injury complained of the defendant knew or was negligently ignorant that it would be unsafe to place the steel or iron structure on pier 10, at the time it was placed thereon, if the jury find that it was unsafe to place the steel or iron structure thereon at that time. (*Rejected.*)

*Defendant's 6th Prayer.*—The jury is instructed that if they find that it was the custom among corporations and persons engaged in the same kind of business as the defendant to rely upon the engineer in charge of the work to see that work and materials furnished by different parties, upon which said corporations or persons were to place materials or structures, were properly built and sufficient and ready to receive the materials or structures to be placed thereon by said corporations or persons, that then the defendant was not negligent in relying upon the engineer in charge of the erection of the bridge mentioned in the evidence, to see that pier 10 was safe, and in proper condition to receive the steel or iron structure to be placed thereon, if the jury find that the defendant did so rely on the engineer in charge. (*Rejected.*)

*Defendant's 7th Prayer.*—If the jury find from the evidence that pier 10 was completed on the ninth day of December, 1908, and that the wooden forms were removed therefrom on the eleventh day of December, 1908, and further find that Mason D. Pratt, the engineer in charge of the bridge employed by the Washington and Berkeley Bridge Company, if the jury find that the said Mason D. Pratt was such engineer, and was so employed, at or about the time the said pier was completed, told William H. Bickel, the foreman, employed by the defendant, in charge of the erection of the steel or iron structure, if the jury so find the said Bickel was such foreman, that the steel or iron structure could be placed on the piers within forty-eight hours after

the forms were taken off, and further find that the said steel or iron structure was not placed on said pier before the 15th day of December, 1908, then the plaintiff is not entitled to recover, even though they should find that the injury complained of was caused by attempting to place the said steel or iron structure on said pier before it had sufficient time to properly set and dry out to sustain the weight being placed thereon.  (*Refused.*)

*Defendant's 10th Prayer.*—If the jury find that Mason D. Pratt was the engineer in charge of the erection of the bridge spoken of in the evidence. employed by the Washington and Berkeley Bridge Company, if the jury so find, that then the defendant was entitled to rely upon the said Pratt as to the length of time it was necessary to wait after the completion of the piers before placing the steel or iron structure thereon, and that the defendant is not liable for the placing of the said steel or iron structure on pier 10 mentioned in the evidence before it had sufficient time in which to properly set and dry out, if the jury so find, and the plaintiff is not entitled to recover in this action for any injury suffered by him by reason thereof, if they further find that in so placing the said steel or iron structure thereon at the time it was done, it acted in accordance with the order or direction of the said Pratt, and unless they further find that before the happening of the injury complained of the defendant knew or was negligently ignorant that pier 10 was then and there unsafe, and of this there is no legally sufficient evidence.  (*Rejected.*)

*Defendant's 11th Prayer.*—If the jury find from the evidence that the plaintiff, at the time when he suffered the injury complained of, was in the employ of the defendant and acting in his capacity as such, and further find that at the same time William H. Bickel was also in the employ of the defendant and was engaged at the same time and place in the same work with the plaintiff, and further find that the injury complained of was caused by the placing of the superstructure on pier No. 10 before the concrete in said pier was

properly set, and that the plaintiff was ordered to assist in doing said work by the said Bickel, and that the plaintiff in consequence suffered the injury complained of, then the plaintiff is not entitled to recover unless he shall satisfy the jury by evidence that in selecting and employing said Bickel the defendant did not use reasonable care in so employing him as a competent workman, and the jury is further instructed that there is no evidence in the case that the defendant did not use such care in said employment. *(Rejected.)*

*Defendant's 12th Prayer*—There is no legally sufficient evidence in this case from which the jury can find that there was any negligence on the part of William H. Bickel. *(Granted.)*

*Defendant's 13th Prayer.*—That under the contract offered in evidence, entered into by the Washington and Berkeley Bridge Company and the defendant, if the jury find said contract was entered into, that it was the duty of the said Washington and Berkeley Bridge Company to provide reasonably safe and sufficient piers for the purpose for which they were intended, upon which the steel or iron structure to be erected by the defendant, under the said contract, was to be placed, and that the defendant was entitled to rely upon the said Bridge Company to perform said duty, and that the plaintiff is not entitled to recover, even though the jury should find that pier 10 was on the morning of December 16th, 1908, green, weak, defective or of insufficient strength, and that by reason of such condition the upstream pedestal thereof gave way when the upstream girder between the said pier 10 and pier 11 was being erected thereon, and that the plaintiff sustained the injury complained of thereby, unless the jury shall further find, that before the happening of the injury complained of, the defendant knew or by the exercise of reasonable care and precaution could have known that said pier No. 10 on said 16th day of December, A. D. 1908, was green, weak, defective or of insufficient strength, as aforesaid, if the jury so find.

And the jury is instructed that it was the duty of the defendant to exercise reasonable care and precaution relative to the condition of said pier at said time, and that knowledge of the condition of said pier at said time, or omission or failure to exercise reasonable care and precaution upon the part of the person to whom the jury may find the defendant intrusted such duty was the knowledge, or omission or failure·of the defendant. (*Granted as modified.*)

The cause was argued before BOYD, C. J. PEARCE, BURKE, THOMAS, PATTISON and URNER, JJ.

*J. Clarence Lane* and *Edgar H. Gans* (with whom were *H. H. Keedy, Jr.,* and *H. Snowden Marshall,* on the brief), for the appellant.

*Charles D. Wagaman* and *Frank G. Wagaman,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

The Washington and Berkeley Bridge Company, a West Virginia corporation, proposing to build a toll bridge across the Potomac river, at Williamsport, between Berkeley County, West Virginia, and Washington County, Maryland, of sufficient size and strength to sustain a track for trolley cars or other cars to be operated by electricity, steam or other power, and to provide ample room for vehicles and pedestrians, in July, 1907, entered into a contract with Mason D. Pratt, a civil engineer, whereby he was to make all necessary surveys for the location of the bridge, and proper plans and specifications for the same; supervise the construction of the bridge and see that the terms of contract with contractors were "properly and fully carried out," and in all such matters act as "the company's agent and representative." The contract further provided "that in all transactions the said engineer shall and will fully realize and so

act and serve the said company in every way that will insure and subserve its best interest, and that his sole object and purpose will be to serve the company solely and absolutely."

On the 6th of August, 1908, the Bridge Company contracted with the Elmore and Hamilton Contracting Company for the erection of the concrete piers and abutments of the bridge, in accordance with plans and specifications annexed, to be completed within four months from the date of the contract, which specified that "The decision of the engineer (of the Bridge Company), shall control as to the interpretation of the drawings and specifications during the execution of the work under them," and on the tenth of August, the Bridge Company entered into a contract with the appellant, the Pennsylvania Steel Company of Philadelphia, a corporation, in which the appellant agreed to "fabricate, deliver, erect and paint sixteen plate girder spans for the above bridge, on piers provided by the (Bridge) Company, including the steel stringers to support a trolley track," according to specifications annexed, and to "fully finish and complete the same within one month after the completion of the piers and abutments." This contract also provided that the decision of the "Engineer shall control as to the interpretation of the drawings and specifications during the execution of the work under them," and the specifications stated: "the piers are to be built under a separate contract and will be of concrete, and it is expected that they will be ready for the bridge contractor to begin placing girders not later than November 1st."

The Elmore and Hamilton Contracting Company began the construction of the piers and abutments about the 1st of September, 1908, and the last pier, pier ten, was completed on the ninth of December. The erection of the steel and ironwork was commenced by the appellant on the 17th of November, 1908. The piers were about one hundred feet apart, and the steel superstructure of each span consisted of two large steel girders, each weighing about ten tons, ex-

tending from pier to pier, and placed on concrete pedestals on top of the piers, seven floor beams and twelve eye beams, weighing in the aggregate about sixteen and one-half tons. On these floor beams was constructed a railroad track, on which the girders and beams were transported from the shore to each span as completed for use in the further construction, and on top of the girders was placed a traveling crane or derrick, called a "traveler," weighing about forty tons and employed in lifting and extending the girders to the next span. The span between piers nine and ten was completed on the 15th of December, and on the 16th of December, while the employees of the appellant, including the appellee, were engaged in erecting the span between piers ten and eleven, pier ten gave way and the steel superstructure between piers nine and ten and the traveler were precipitated into the river, and the appellee sustained the injuries for which this suit was brought.

During the trial, which resulted in a judgment and verdict for the plaintiff, the defendant reserved twenty-two exceptions to the rulings of the Court on the evidence. At the conclusion of the testimony the plaintiff offered two prayers and the defendant seventeen, and the twenty-third exception is to the overruling of defendant's special exception to plaintiff's first prayer as modified, to the granting of plaintiff's first prayer as modified and plaintiff's second prayer, and to the modification of defendant's fifteenth prayer, and the rejection of defendant's first, second, third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, thirteenth, sixteenth and seventeenth prayers. As the defendant's first prayer asked the Court to instruct the jury that under the pleadings there was no legally sufficient evidence to entitle the plaintiff to recover, it is necessary to examine the declaration and to consider the evidence somewhat in detail.

The declaration charges that the defendant, on the sixteenth of December, 1908, "was engaged and for some time theretofore had been engaged in the erection and construc

470 PENN. STEEL CO. vs. NACE.

tion of a bridge across the Potomac river, at Williamsport, in the county and State aforesaid, that said defendant was then and there placing the structural iron and steel work used in the erection of said bridge upon piers or abutments which had lately theretofore been constructed of cement, sand and stone and commonly called concrete work, and which concrete piers and abutments stood about equi-distant from each other across said Potomac river; that this plaintiff was then and there employed by the defendant and was then and there the servant of the defendant and was engaged in the work of placing said structural iron or steel work on said piers or abutments, and was then and there using due care and caution on his part; that whilst this plaintiff was so engaged in his aforesaid work it became and was the duty of the defendant to exercise all reasonable care to furnish, provide and maintain a reasonably safe place for the plaintiff to perform his work, aforesaid, and to avoid exposing the plaintiff whilst so employed to any extraordinary and unreasonable peril, against which this plaintiff from want of knowledge and skill could not by the exercise of due care on his part guard himself; yet the defendant well knowing its duty in the premises, and well knowing or by the exercise of reasonable care and caution on its part could have known that a certain one of said piers, to wit: pier known as "Pier No. 10," was, then and there, and at that time, to wit: on the morning of December 16th, 1908, green, weak, defective and of insufficient strength to carry the weight for which it had been constructed, and well knowing that this plaintiff by resaon of lack of the requisite scientific knowledge, skill and experience could not by the exercise of ordinary care and prudence guard himself against the weakness, defectiveness and insufficient strength of said Pier No. 10, negligently ordered and directed this plaintiff to proceed with his work of placing said structural iron or steel work upon said Pier No. 10, and while so engaged, to wit, on December 16th, 1908, at Washington County, aforesaid, and whilst this plain-

tiff was using due care and caution on his part, the said Pier No. 10, by reason of its weakness, defectiveness and insufficient strength collapsed and broke down under the weight of said structural iron or steel work, and this plaintiff by reason of the defendant's negligence aforesaid, was hurled and thrown from said bridge many feet into the river below and thereby was greatly injured."

The evidence shows, or tends to show, that pier 10 was properly constructed, and in the manner and of materials of the character and quality provided for in the contract and specifications. According to the testimony of a number of witnesses, experienced in concrete work, including R. E. Clower, who superintended the building of the piers, it takes from three weeks to thirty days after what is called the "initial set" for concrete to dry out and harden sufficiently to sustain heavy weights, and that it is the custom to wait that length of time before putting heavy weights on concrete; that the first action after the concrete is placed in position, is the "initial set," and then the drying out and hardening process begins, and the length of time it takes to dry out and harden depends somewhat upon weather conditions, if the temperature is about freezing point or below the concrete retains its moisture and will not dry out and harden, and newly made concrete will not set. One of these witnesses, W. K. Dau, a civil engineer who had been engaged in building bridges and concrete piers for a number of years, testified: "I was at the Williamsport bridge on Friday morning after the accident, went on top of pier 10 and examined the concrete to ascertain what condition it was in at that time. I went there at the request of the State's Attorney and testified at the corner's inquest. When concrete is mixed and placed in position the first action that takes place is called the initial set, which should take place within an hour. The drying out process comes after that; it takes a firmer set and then the hardening process takes place, which is called setting up. Compression strength is given to concrete to hold

weight by age. This is the hardening process. I examined the top of pier 10 but did not go over the pedestal, I was afraid to go over but I stood on the other end of it. I had a hammer along with me and the concrete was in such a condition, that you could break the stones away from the mortar; it was rather wet, which indicated that the concrete was entirely too green to be put to any use, from my experience I could not say as to the materials except the stone and the mixing of it. The stone appeared to be all right, some pieces of it rather large, but it was mixed thoroughly and seemed to be tampered properly and well put up. · I think in time it would have made a fairly good job. Weather conditions affect the setting up of concrete in order to use it, where the thermometer would be around freezing or below, the weather conditions are regarded as unfavorable to the setting or hardening of concrete, around freezing or below newly made concrete will not set, it would keep too much moisture in the concrete, it would not dry out and would not form well." This witness further testified that he had heard all the testimony in the case, and assuming it to be true, the superstructure supported by piers nine and ten was not a reasonably safe place for the workmen to go on the 16th of December, 1908, for the purpose of placing the girders between piers ten and eleven; that there is a condition in concrete known as "greenness," which means that the concrete has not dried out, in other words it is still wet. The drying out process has not hardened it yet; "that a person of ordinary skill and knowledge of the action of concrete could have ascertained the greenness of pier 10 by going upon it and inspecting it, and that any man familiar with the mixing of concrete and putting it into form and experienced in seeing it set, could have seen that the· pier was green." Witness, Charles E. Phelps, Jr., a mechanical engineer of experience in concrete work, when given the manner in which the piers were built; the materials used; the temperature for several days after the completion of pier 10, and the weight of the steel super-

structure, testified that it was not safe to place that weight on pier 10 at the end of seven days from the date of its completion, and that the natural and probable consequence of doing so would be "a failure of the material, constituing the pier. It would probably be crushed at the top of the pier. A crushing of the material would result, a crushing of the concrete; a failure of the concrete itself to support the weight;" and that if the pedestal on the pier, which supported one of the girders went down under such circumstances, "It would be due to the fact that the concrete was not sufficiently set at the time the load was put on; and the going down of the load and the crushing of the concrete pedestal would be due to the fact that it was loaded before the concrete had hardened." The evidence further shows that the temperature at Chewsville, about fourteen miles from Williamsport, from the 6th of December to the 16th of December, 1908, was as follows: "On December 6th the maximum was 39 degrees and the minimum 23 degrees, on the 7th 45 and 27, on the 8th 36 and 20, on the 9th 38 and 24, on the 10th 37 and 15, on the 11th 38 and 30, on the 12th 39 and 27, on the 13th 44 and 23, on the 14th 47 and 25, on the 15th 39 and 27, on the 16th 52 and 31." Frank L. Benning, an employee of the defendant, who was working on the bridge at the time, described the accident as follows: "I have known the plaintiff for about four years, at the time of the accident he was engaged as signal man on the traveler, he and I were both working for the Pennsylvania Steel Company, the Steel Company was placing the steel work on the bridge, using steel girders about one hundred feet long and about six feet high, the top and bottoms of flanges about fourteen inches wide, weighing about ten and one-half tons each, two girders being placed in each span on pedestals on the top of the piers which piers and pedestals were of concrete, pier ten was about thirty feet high, the girders were placed in position with a derrick steam traveler. The traveler is a crane that runs on top of the girders on top of the

flange, and lets space enough under it to run a car between the girders and on top of this is an A frame put up which is a piece of iron running from one side of the traveler to the other, making something like the letter A, upon this the boom hangs which is a piece of iron or wood that reaches out and handles the material, an engine placed on the back of the traveler furnished the power for the operation, it was my duty to run the engine, the .traveler is clamped to the girders in four different places near each corner, there were four men including the plaintiff working on the traveler at the time of the accident, I think there were fifteen or sixteen men working on the bridge including the four working on the traveler, the plaintiff was giving signals to me and the other workmen, he stood on the front end of the traveler on the right hand side between the legs of the A frame, where he could see all the workmen, we went to work that morning at eight o'clock and worked about a half hour, got my machinery in shape ready to put the girder out and put it out and at that time the accident happened, we picked the girder up and lowered it out to its place, as near as we could get it, and had to lower it down almost in position temporarily so it could not wave, to allow the men to cross over to pier eleven and while we had it landed and the men were in the act of getting on the girder to cross over, the pier gave way and the traveler went down, the full weight of the entire girder had not been let down on the pier, up to the time of the giving way of the pier everything, men and machinery, had been working all right, the first thing I noticed was that the pier gave way, and I saw the traveler leaning, felt it giving way under.me, it started slowly."

The plaintiff testified that he was forty-eight years of age, and had been engaged in work of bridge building for twenty-four years; that he had been employed by the Pennsylvania Steel Company since 1896 or 1897; that he had not had much experience in building steel work on concrete work, and that the first work of that kind was in 1905 or 1906, and that

prior to that time steel "superstructure was generally placed on stone piers or abutments"; that he was employed by the defendant to work on the bridge of Williamsport, and went to work there the 1st or 2nd of December, 1908; and that he was directed to go there by a letter from Mr. Ritter, from the office of the appellant at Steelton. He further testified: "When I got there they had the ground derrick close to the track where they unload the steel; they had one span up and the traveler ready to put the boom in place the day we went to work; my duty was giving signals on the traveler; the concrete piers were completed from the Maryland side as far as pier nine; pier nine was then finished, to the best of my knowledge; we started to get the boom up on the bridge abutment to pier number one on the Maryland bank. I continued there from that time on until the 16th day of December, every day, as we kept getting one span out and the floor beams and eye beams in and put our track down and put the rail on to run our trolley cars to carry out the girders, so the traveler could take them up, and kept on one day after the other unless raining or snowing. On the morning of December 16th our traveler was standing within about eight or ten feet from the pier ten; I do not know how long the traveler was, I never measured it. I should judge about forty feet. Girders were about one hundred feet long, each weighing ten or ten and one-half tons; between the girders which rested between piers nine and ten there were seven floor beams, each about one foot wide on the top and between twenty-two and twenty-three feet long, each weighing about three thousand pounds; there were also twelve eye beams fifteen inches deep, weighing about one thousand pounds each; the traveler and equipment that rested on the iron girders, as near as I can judge, weighed about forty tons. On the morning of the 16th of December we went to work at eight o'clock. On the 15th we put the girder off the truck. On the 16th we picked it up. I would boom out until the girder came close to the track; then would have to pick up the load

again and boom out and keep on that way until it reached pier eleven. Just as we landed it temporarily I gave the engineer the signal to drop the dog in front of the engine. I looked around and saw the concrete dropping down along the pier, and I grabbed for the cable, but whether I reached it I could not say. We had landed the girder temporarily, to keep it so the wind wouldn't blow it around and the men could walk across to shore it up on pier eleven. We had not let all the weight of the girder down, just a little, so it would rest there and would not wobble around. It would hold more firm by landing it the least bit for the men to walk across. I stood on the front end of the traveler about ten or twelve feet higher than pier ten, and I was back about eight or ten feet from the pier. I saw the concrete falling under the girder. Right under the girder it commenced to dribble down along the pier on the Maryland side on the upstream corner. It just went gradually down until it broke away a little piece, and then went with a crash. After that I don't remember anything until about ten or fifteen minutes; it may have been only five minutes until I came to. I have been working with travelers for the last twenty-four years. I am familiar with the operation of a traveler. Everything that morning was going along nice and smooth and had been from the beginning of the work. Nothing had occurred or gone wrong from the start with the machinery or the traveler from the beginning to the day of the accident. The girder had been setting on the track over the night of the 15th, across stringers on the down-stream side of the two girders. There were two girders from pier nine to ten. This additional one was between them about six feet from the down-stream girder." Plaintiff also stated that he was careful about his work; that he was not warned by the appellant that it was not safe to go on the bridge that morning; that he did not know anything about the weight-bearing strength of concrete, and that it was out of his line, and he had never mixed any concrete or given it any

thought; that he had seen concrete mixed with sand, rock, cement and water, and knew that you cannot work on concrete until it has hardened a little, but did not know how much it must harden, and that at the places he had worked the "concrete men had always finished and moved away"; that William H. Bickel was foreman, and they went by his instructions; that Mr. Pratt was the chief engineer; that the approximate height of pier ten was forty-five or forty-six feet, and that the pedestal on the upstream end of pier ten was five feet long across the pier, about thirty inches wide and about two feet high.

William Bickel testified in behalf of the defendant as follows: "Am 37 years old; I live in Dauphin, Pennsylvania; am an iron worker, and have been since 1891. I am not an engineer or a graduate of any college; my knowledge of iron work is derived from my experience as an iron worker. I am not a concrete expert. I was foreman of the steel erection of the Williamsport Bridge and had a number of men under me, one of whom was my nephew, Ross Bickel, who was one of the men killed in the accident. The steel work came from the shops at Steelton in bulk, made up, ready for erection. I know Mason D. Pratt. He was engineer in charge of the job at Williamsport; Mr. Darby was his assistant. Mr. Pratt came about once a week; while he was away he left his assistant in charge. The Elmore and Hamilton people were putting up the concrete piers; we started the job on November 17th, 1908; we started from the Maryland side and went along out past pier nine and had our steel on pier ten at the time of the accident. Up to this time we had not had any trouble with any of the concrete work; everything had gone perfectly smooth and satisfactory. On the 9th or 10th of December, 1908, close to the yard engine, I had a talk with Mason D. Pratt about when I should put the steel on pier ten. Mr. Dainey, the engineer of the engine, was standing close by at the time. I asked Mr. Pratt whether he would have the piers completed so we could keep on erecting, and

he said he thought they would, and I asked him how soon we could go on the piers after they were completed, and he said to me, 'Forty-eight hours after the forms are taken off.' I do not remember what span we were then working on, but think we were on or about the seventh span. We went on pier nine six or seven days after the forms were taken off; it stood up all right and there was not any trouble about it. We came to pier ten and erected span ten on the fifteenth. I examined pier ten with a bar, and jabbed around on it to see how hard it was; it was not perfectly dry; it was well set, though. I had also examined pier nine, and there was no difference between nine and ten, as far as my examination showed; pier nine was not dry when we went on it, and I did not notice any difference as far as wetness between the two. I was out on each pier while the steel was being erected three or four times every day. I was at pier ten on Tuesday the fifteenth, and looked over everything and did not see anything wrong, and went out next morning before we started to work and did not see anything wrong. A few minutes before the accident I went back to the yard and was helping to load a girder when the accident occurred. On all jobs we always go by the engineer's orders and directions. I had worked on other bridges, putting steel work on massed concrete." On cross-examination Bickel stated that he did not know anything about concrete and had never had any experience in it; that he testified before the coroner's jury that he had charge of the steel work, and had instructions to keep on erecting from the home office; that they had just about finished pier ten when Mr. Pratt told him that he could go on the pier forty-eight hours after the forms were taken off; that he did not recollect seeing Mr. Pratt at pier 10 after it was finished until after the accident. He further stated that no one from the home office told him to stop, and no one from the home office told him to disregard the orders of Mr. Pratt; that he never disobeyed any orders from Mr. Pratt during the time he was working on pier ten; that no

one told him to stop, and that the only jobs of bridges placed upon concrete piers in his experience, other than the Williamsport bridge, was one in Alabama and one in Schnectady, New York.

Thomas Earle, superintendent of the bridge and construction department of the defendant company and a civil engineer, stated that he had been in the employ of that company since 1891; that he knew of the contract between the Washington and the Berkeley Bridge Company and the defendant; and that the defendant undertook the work under that contract; that he had known Mr. Pratt since 1887; that Mr. Pratt graduated from the Lehigh University in 1887, and was at one time employed by the Phœnix Bridge Company, and in 1891 was in the employ of the defendant as the engineer of the frog, switch and signal department, and remained in that position until 1904 when he went into the business of consulting engineer, and has been in that business ever since; that he is a member of the Am. Society of Civil Engineers, and in addition to the work he did for the defendant he has since been engaged in engineering work for the Central Pa. Traction Company, the largest traction company in Harrisburg, and was engineer for that company in the building of the car house and car barn of reinforced concrete; that the general custom among contractors for bridge work, such as the defendant "was engaged in and the character of the work, such as the erection of steel and iron superstructure upon piers and abutments, such as the Williamsport bridge, and as to the method of having the work done and the inspection of the work of other contractors is to do it, under a contract and specifications, which provides that the owner shall have an engineer in charge of the work, and the contractor is to do the work in accordance with the contract and specifications and the orders of the engineer employed by the owner and to the satisfaction of that engineer"; that the defendant "carried on the work at Williamsport in accordance with that custom"; that the experience of the defendant in

following that general custom has been satisfactory, and that prior to the accident at Williamsport the defendant had never had an accident charged against the engineer or another independent contractor, but that he had heard about such accidents in the engineering papers. On cross-examination he stated that he knew Mr. Pratt had made other designs for bridge work, but that the Williamsport bridge was the only bridge that he knew of that Mr. Pratt was engineer for; that "bridge work is different from other work, but that it does not make any difference as to the effect upon concrete whether the weight placed upon it is a bridge or another kind of structure." On re-cross-examination he further stated: "I know something about concrete; I know that green concrete will not support weights that are too heavy for the size of the concrete. We sold the superstructure of the Williamsport bridge by the pound. When we sent it out we knew what it weighed; personally, I never estimated the weight which each pier was to carry, but I could have known that from the data in the office; the defendant could have known that. The defendant had the plans." The defendant offered further evidence tending to establish the custom testified to by its superintendent.

The charge in the declaration is, in substance, that pier ten was green and of insufficient strength to sustain the weight placed upon it; that the plaintiff was ignorant of the fact, and could not, by the exercise of ordinary care, have discovered it; that the defendant knew, or by the exercise of reasonable care could have known, of the condition of the pier, and that by reason of the negligence of the defendant in directing the plaintiff to go to work on the superstructure placed on said pier, when it was green and not of sufficient strength to sustain the weight, the plaintiff, while exercising due care, was injured. The evidence shows that the injury occurred by reason of the fact that the superstructure of the bridge and traveler were placed on it when it was green, and before it had had time to dry and harden; that it requires

from three weeks to thirty days for massed concrete to harden sufficiently to sustain heavy weights, and that it is the custom of those engaged in erecting bridge work or placing heavy weights on concrete to allow from three weeks to thirty days to elapse before placing heavy weights on it; that the plaintiff did not know, and could not by the exercise of reasonable care have known, that pier ten was not in a safe condition, and that he was not warned by the defendant not to go to work on the span resting on said pier until it had had time to dry and harden; that the fact that it required from three weeks to thirty days for massed concrete to harden was generally known by those engaged in the business of erecting bridge work or other heavy structures on concrete piers or abutments, and that the appellant was engaged in that business, and did not warn the plaintiff or its other employees engaged in the erection of the bridge at Williamsport of the danger of working on said piers before they had sufficiently dried and hardened to sustain the weight to be placed on them, and of the necessity for waiting three weeks or thirty days after the completion of the pier before placing the steel work on it.

The principal contention of learned counsel for the appellant is that as the piers were not constructed by the appellant and were not under its control, it is not responsible for any injury resulting from the condition of the pier at the time of the accident. It is further contended in their brief that, having followed the custom to rely upon the engineer of the Bridge Company, the appellant was not required to inspect the pier or to warn the appellee of the time required for it to harden. There is a line of decisions to the effect that where the place where a master's servant is required to work was not erected by the master, and is not under his control, the master is not liable for any injury sustained by his servant by reason of any defect in its construction, but the decisions on that point are not harmonious, and there are many well-considered cases maintaining the opposite view. In this case, however, the injury did not happen by reason of any

defect in the construction of the pier; on the contrary, the evidence tends to show that the piers were properly constructed; but all the evidence tends to show that the accident happened because the weight of the superstructure of the bridge was placed on pier ten before it had time to dry and harden. The accident was not chargeable, therefore, to any negligence of the company that erected the pier, but was due entirely to the fact that the appellant placed its employee at work on it before it had had time to harden. Under such circumstances the cases to which the appellant refers and upon which it relies do not apply. Neither the foreman nor the appellee knew that it was necessary to wait from three weeks to thirty days before placing the superstructure of the bridge on the pier, and they were not told or warned by the appellant of the danger to which they would be subjected if they attempted to do so. They could not by the exercise of ordinary care have known of the danger, and it was the duty of the appellant to have taken the necessary precautions for their protection, by either warning them not to go on the pier until the three weeks or thirty days had elapsed, or by inspecting the pier before sending them on it. In the case of *Hamelin* v. *Malster,* 57 Md. 287, JUDGE ALVEY said: "Nor is the master justified in knowingly or negligently exposing the servant to any extraordinary or unreasonable peril in the course of the employment, against which the servant, from the want of knowledge, skill or physical ability, could not, by the use of ordinary care and prudence, under the circumstances of the case, guard himself. For the violation of duty in these respects by the master, whereby injury is sustained by the servant, the master is justly liable. These principles are laid down in a great number of adjudged cases, and have been explicitly enunciated by this Court." In the case of *Eckhardt* v. *Lazaretto Co.,* 90 Md. 177, the law is clearly stated by JUDGE SCHMUCKER as follows: "The law governing the relation of employer and employee has been the subject of many adjudications and may be said now to be

fairly well settled. Ordinarily it is incumbent upon an employer in a large manufacturing establishment like that of the present appellee to furnish a suitable place in which work may be performed with a reasonable degree of safety to his employees, and without exposure to dangers that do not come within the obvious scope of the employment as usually carried on. He must also provide him with reasonably safe and proper tools and appliances, and must inform the employee of any latent risks of the employment which the latter would not be likely to know or appreciate, but the employer is not responsible for injuries resulting from those dangers which are the subject of common knowledge or can be readily seen by common observation, or which were known to the employee, or by the exercise on his part of a reasonable degree of prudence might have been known to him.

When the occupation carried on is in its nature so extra-hazardous as to be dangerous to human life or health, both justice and humanity require that the employer should take all reasonable and needed precautions to secure safety to the employees, and make clearly known to them the inherent dangers of the service, and would especially acquaint them with such risks as are ascertainable only through a knowledge of scientific facts, which an uneducated man is not presumed to know. Some of the cases go so far as to hold that in specially hazardous occupations the employer must make and enforce reasonable rules and regulations for the conduct of the work in order to protect the employees from the dangers of the service. A failure on the part of the employer to afford the protection due from him to the employee will render him liable for injuries occurring to the latter as a result of such failure." The same principle was recognized and applied in the opinion delivered by JUDGE BOYD, in the case of the *Am. Tobacco Co.* v. *Strickling,* 88 Md. 500, where the master was held liable for exposing a girl to the dangers of a rapidly revolving shaft, of which she was not warned, and in the very recent case of *Manuel* v. *Cumber-*

*land,* 111 Md. 196, where the City of Cumberland was required to answer for injuries received by an employee, while working in a trench, by reason of the proximity of a gas main, which caused the sides of the trench to give way, in which case JUDGE PEARCE said: "Where, as in this case, there was a probable source of danger unknown to and undiscoverable by either the plaintiff or the foreman, but known to the defendant, or which must have been known upon comparing the location of the sewer with that of the gas main, there is the strongest reason for the application of the rule above stated. If the foreman had been furnished with a drawing of the location of this gas main wherever it was in close proximity with this trench, it is reasonable to presume that he would have taken such precautions as he deemed reasonable to secure safety at the place of this accident, either by shoreing up the side of the trench, or some other appropriate means, and that he would not have peremptorily ordered the men to go into the trench, if he had had reason to believe it was unsafe."

The appellant cannot rely upon a custom among those engaged in building bridges, to trust to the engineer, to relieve it of a duty imposed upon it by law, to take proper precautions for the protection of its employees. It was said in *Raisin* v. *Clark,* 41 Md. 158: "A usage in contravention of a well settled and salutary rule of law cannot be sustained by Courts of justice," and in *Susquehanna Fertilizer Co.* v. *White,* 66 Md. 444, that "It has been repeatedly decided that a usage must not be in restraint of trade; that it must not conflict with public policy and the law of the land, and that it must be reasonable and not productive of injustice in its practical operation." See also *First Ntl. Bank* v. *Taliaferro,* 72 Md. 161.

Nor can the appellant escape liability on the ground that it relied upon the engineer of the Bridge Company to warn its employees of the danger of going to work on the piers before they had had time to harden, and to see that the

place in which they were required to render services to the appellant was reasonably safe. This was a duty that the appellant owed to them, and if it entrusted it to another person, it was liable for his negligence in the performance of it. Mr. Pratt was not the fellow servant of the appellee. In the case of *Hamelin* v. *Malster, supra,* JUDGE ALVEY said: "To the general rule, however, there is this qualification or excpetion that where the middleman or superintendent is entrusted with the discharge of the duties incumbent upon the master, as between the latter and the servant, there the master may be liable for the omission or neglect of the manager or superintendent in respect to those duties." And in the case of *Manuel* v. *Cumberland, supra,* JUDGE PEARCE, speaking of the duty that the master owes to his servant, and the right of the servant to rely on the master for a proper discharge of that duty, says: "He has a right to look to the master for the discharge of that duty, and if the master, instead of discharging that duty himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employee, or the latter's right to insist that reasonable precaution shall be taken to secure safety in these respects." This rule has been repeatedly followed in this State. *Pikesville, etc.,* v. *Russell,* 88 Md. 563; *P. W. & B. R. Co.* v. *Devers,* 101 Md. 341; *Bernheimer* v. *Bager,* 108 Md. 551; *B. & O. R. R. Co.* v. *Baugh,* 149 U. S. 368.

We have carefully examined all of the prayers to which the defendant's exception relates. The Reporter is requested to set these prayers out in his report of the case. Plaintiff's first prayer as modified and second prayer fairly presented the case to the jury, and required the jury to find all the facts essential to the plaintiff's right to recover. Defendant's special exception to plaintiff's first prayer was properly overruled. The evidence shows that it was generally known among those engaged in the erection of bridges and other heavy structures on massed concrete that it is unsafe to subject concrete to heavy weights until it has had time to

dry out and harden, and that the usual time allowed is from three weeks to thirty days. It would unduly prolong this opinion to discuss separately the rejected prayers of the defendant. They were framed to present the several contentions of the defendant which we have already considered, and for the reasons we have stated we think they were properly rejected. In regard to the modification of the defendant's fifteenth prayer it is only necessary to say, as we have already stated, that if the defendant entrusted the discharge of its duty to the engineer of the Bridge Company, then it is responsible for any neglect on his part in the discharge of that duty.

We have carefully examined all of the numerous exceptions to the rulings of the Court on the evidence, and do not find reversible error in any of them. The plaintiff was not only required to show that the accident happened, but it was also incumbent upon him to show that it happened by reason of the negligence of the defendant. To meet this requirement it was necessary for him to show what caused the giving away of pier 10, and to that end, to show that it was properly constructed, but gave way when the superstructure was placed on it because it was green and had not dried or hardened. The testimony of those familiar with concrete construction, in regard to the properties and hardening process of concrete, and the time it takes to dry out, and the usual time allowed for the hardening process, and their opinion as to the danger and the natural result of placing heavy weights on it before it has hardened, etc., was proper and legitimate evidence. In regard to the last two exceptions, which are to the rulings of the Court refusing to permit the witnesses to state what the general reputation of the engineer, Pratt, was, it is sufficient to say that the defendant was not prejudiced by these rulings, for, as has been said, if the defendant entrusted to him the discharge of its duty, then it was responsible for his omissions regardless of his general reputation as an engineer. In regard to the two ex-

BLICK vs. MERCANTILE TRUST CO. 487

ceptions to the rulings of the Court, refusing to permit the witness, Dau, to answer the question relating to the sand which he found, and the other piles of sand about the pier, we need only add that the defendant could not have been prejudiced by the rulings, as there was no offer or effort made to show that the pier was not properly constructed.

Finding no reversible error in any of the rulings of the Court below, we must affirm the judgment appealed from.

*Judgment affirmed with costs.*